The cases we will call will be as previously announced and the times will be as allotted to counsel. The first case today is number 191316, American Trucking Association, Inc., et al. v. Peter Alviti, Jr., et al. Good morning, Mr. Roscoe. Good morning, Your Honor. May it please the Court, I'm Charles Rothfeld, representing the plaintiff's appellant in this case. And if I may, I'd like to reserve five minutes for reply. You may. Thank you. The question in this case is whether a bridge or a highway toll is a tax within the meaning of the terms that's used in the Tax Injunction Act. And the answer is that it is not. It is a paradigmatic, tolls are paradigmatic user fees of the kind that are not regarded as taxes and that, therefore, fall outside the main terms of the Tax Injunction Act. And we reach that conclusion for two independent reasons. The first is by looking at the specific indications of what Congress had in mind when it enacted the TIA. At that time, Congress would have thought that tolls are not taxes, that they fall outside the meaning of the term. And, therefore, when it used the word tax in the TIA, it would have intended to exclude tolls. In the late 19th century, the Supreme Court in Sam's case said, made exactly that distinction between tolls and taxes. The Court said that, and I'm quoting the Court's terms, tolls are merely compensation for benefits conferred. There is no analogy between the imposition of taxes and the levying of tolls for the improvement of highways. And suppose we thought that Sam's case was perhaps not quite as clear as you think it is. What are your other arguments that Congress, at the time, understood tolls not to be taxes? In the period between the decision in Sam's and the enactment of the TIA, a significant number of decisions, which we cite in our brief and quote in our brief, pointed to the Sam's language, adopted the Sam's statement, and said, in so many words, tolls are not taxes. In those cases, Sam's clearly recognizes a distinction between taxes, which are sovereign, charges are sovereign, and then proprietary or proprietorship-type fees. Sam's involved a private party who had improved a river and was authorized by the state to charge tolls. Here, we have a governmental entity that's charging the fee. Do you have precedent that that falls on the proprietorship rather than the sovereign side? In other words, can Sam's be read as saying tolls, i.e., charges by private parties as opposed to charges by both private parties and the sovereign? I think not, Your Honor. In Sam's itself, it's true that it was a private party that was imposing the toll, but it was authorized to do that. In order to impose a toll, it had to be approved by the governor, it had to be approved by the attorney general. The amounts were set by the state. Sure, but to practice law, you have to get approved by the state, but your fees aren't taxes of the state. To go beyond that, in the years after Sam's was decided, a number of cases, and again, highways and tolls, tolls were imposed by the state, and the courts in those cases used exactly the same language as in Sam's. They pointed to Sam's as authoritative and said, tolls are not taxes. As you point out, in Judge Cooley's treatise on taxation, which the Supreme Court has said is authoritative, he uses exactly the same language, shows exactly the same distinction, and says, in so many words, tolls are not taxes. When Congress enacted the TIA, shortly after the decisions that we cite in our brief, and shortly after that edition of Cooley was published, it would have understood that tolls are not taxes. When it used the word tax in the statute, it would have thought that tolls were excluded, which I think makes sense because tolls, again, are classic paradigmatic user fees. They are imposed on the user of property for the privilege of using that property in amounts that are calibrated to pay for improvements and maintenance of the property, and are used only for that purpose. That is a paradigmatic user fee. It's not a tax in the ordinary sense, and we think that that is all the Court needs to know to decide this case, that the Congressman, in an act of the TIA, would have had that distinction in mind. This Court, the Supreme Court, has said over and over again that when a term, statutory term, is not defined in the text of the statute, it must be interpreted in light of the contemporaneous understanding, ordinary usage of the term, and in 1937, when Congress enacted the TIA, for the reasons that we've been discussing, it would have thought that tolls are not taxes, and so I think that the Court must give that reading to the statute, because that is what Congress would have had in mind when it used that term, and although we think that that is the end of the case and is enough to decide the appeal, I'll add that this distinction between tolls and taxes, going back to the 19th century, remains the distinction that the Courts consistently, uniformly draw to this day. You know, Judge Posner, for the en banc, the Seventh Circuit, wrote that a user fee, for example, a toll, a charge, a toll for crossing a bridge, is not a tax, neither lay or legal, bingo. I'm sorry, which opinion are you citing from? This is the Empress Joliet Casino case in the Seventh Circuit, which was discussed in the briefs, and the distinction that was drawn between tolls and taxes, tolls as a form of user fee, was clear in that case. In every case of which we are aware, in which the distinction between tolls and taxes made a difference to the outcome, we cite these in our brief, and the State does not deny that in every one of those cases, the Court has held, the Courts involved have held, that tolls are not taxes. Well, how do you deal with our opinion in San Juan Cellular, in describing the spectrum where the Courts have used what we describe as a rather uniform policy or factors? We cite the Seventh Circuit Schneider case, and we describe it in San Juan as Wisconsin Department of Transportation charge upon trucks, it was a tax because the charge was used to help pay for highway construction, a general type of public expenditure, which seems to be exactly what the analysis that the District Court developed here. What are we to do with our citation to Schneider in San Juan? Well, Schneider was not a toll, it was a license fee, and therefore, whether or not Schneider was a toll. But that was held to be a tax. So, that sounds like it's on the other side of what we have here, and yet it was still held to be a tax, and we seem to find nothing unusual about that. Well, I'm distinguishing tolls, which are a specific kind of user fee, from taxes, and the Schneider case did not involve a toll, and so it falls outside the Cooley-Sands distinction between being tolls and taxes, so even assuming that Schneider was correctly decided, and the Schneider analysis on this question was one line, was not very elaborate, but even accepting that as correct, I don't think that has any bearing on what's going on here. This is a different kind of charge, this is a user fee, a toll, which historically has been a tax. I understood your second argument to be that the District Court, in any event, misapplied the public purpose test from San Juan. One thing that strikes me is the most current Supreme Court opinion on the Tax Injunction Act is Hibbs v. Winn, which was not even cited by the District Court, and so I'm wondering a little bit about whether our circuit law, going back to the 1980s in San Juan, in fact has been affected by the Hibbs decision, which seems to say, well, the mere fact that there's a public purpose certainly doesn't answer the question of whether something is a tax or not. It takes a view of the Tax Injunction Act, which is more restrictive than some of its earlier statements. I think that that is correct, Judge Lynch, and I would add that this Court, well before the Hibbs case, in the Traylor-Romine case, which is also not cited by the State, recognized that terminology like public purpose is sometimes helpful and sometimes isn't, and in the Traylor-Romine case itself. Okay, so your argument based on circuit precedent is that San Juan itself is properly interpreted in Traylor-Romine and that the District Court got it wrong here, and so we don't even have to look at the effect of the latest Supreme Court decision? I think that all of them point in the same direction. I think that the Hibbs case, I think the language that you point to is helpful. Obviously, the factual circumstances there were not the same as what's going on here. One wonders whether Hibbs carves out a special rule for Establishment Clause cases when the Establishment Clause area, but thus far, nobody has suggested that it is so limited. I agree with all of that, Judge Lynch, but I also agree with your prior statement that our view is that this Court's precedent in Traylor-Romine and in San Juan Cellular and the Cumberland Farms case all point in the same direction. We think that they say that you have to interpret, you have to look at all the characteristics. Let me take a step back. We think that the history and the particular understanding of the word tax and toll, the relationship between those terms at the time of the enactment of the TIA, kind of puts this case in a separate category because we think that this particular kind of charge was something that Congress had a particular impression of, understanding of its relationship to taxes. But you have to concede that repair of highways and repair of bridges, when the state has done a study and said they're actually not adequate and they need to be repaired and restored and we need the money to do it, so this is a legitimate way of addressing a state problem. You have to admit that that's a public purpose. We do. We don't deny that repairing the roads is a public purpose, just as in Traylor-Romine providing for accident compensation insurance, the Puerto Rico program for doing that was a public purpose, just as in San Juan Cellular maintaining an operational public service commission was a public purpose, an important public purpose. So we don't think that that gets you to the end of the analysis. That's a consideration that the courts have taken. Okay. So let's go back to the purpose of the Tax Injunction Act, which says, at least in certain sort of cases, brought in federal court, here it's a constitutional challenge, if there's going to be a significant disruption of the flow into the state treasury from its taxes, we don't want the federal court intervening in that. The state courts are perfectly competent to handle it. So thinking about Congress's purposes, how are they best served in this case? Well, Congress wanted to prevent interruption of the flow of tax revenue. And so that doesn't answer the question whether this is a tax or not. We know for sure from cases like Traylor-Romine and San Juan Cellular that simply because federal litigation might interfere with the flow of revenue, that doesn't answer the question. That only poses the question, is this a tax or is it something else? Well, there seems to be an argument that the limitation in the Tax Injunction Act to taxes, the other side of that is a desire not to stop federal jurisdiction in cases that don't involve taxes. An important national interest is served in having federal court jurisdiction over such cases. We think that that's exactly right. And a case like this is a key example. This is a case involving an allegation that the state is discriminating against out-of-state entities and people who are engaged in interstate commerce, which is precisely what federal courts are best positioned to decide. What do we make of the fact that the Rhode Island legislature itself labeled this as a toll and not as a tax? Well, we have a disagreement with the state about the significance of that. We think that that is part of the inquiry. Again, once we get past our initial argument that the fact that this is a toll decides the case. But once we get into the more general test that this Court has used, the Court said in Cumberland Farms that the nomenclature used by the legislature is not dispositive, but it is one of the things that goes into the mix. Because I think it suggests how it is that, generally speaking, people regard this kind of charge. And the legislature clearly thought this charge was not a tax, it was a toll, it was something else. Would it really have made a difference, suppose they hadn't said, it's not a toll, it's just a tax that we're going to selectively apply? You want to go across the Narragansett Bridge, you're going to have to pay a fee to do it. Again, we don't think that the label is dispositive, but we think it is suggestive. And here, that is one of all the criteria that this Court has identified in St. Monticello or Cumberland Farms, Trelawney, and we list them in our briefs. We think all of them point to the same direction, that this is a fee, not a tax. Are you familiar with the decision in the Hill case by then-Judge Gorsuch, now Justice Gorsuch? Yes, I am. All right. From your point of view, how would that case be distinguished? That case was obviously not a toll. So we think that takes it out of our first set of criteria. But even again, if you look at the more general test that the Court has used, that was not a user fee. That was a charge for a license plate that, as Judge Gorsuch emphasized, then-Judge Gorsuch The funds that were raised through that were not devoted to something that only exclusively the things that benefited the payer of the fee that went to the State's General Treasury, which I think is a key indicia that something is a tax and not a fee, not a toll. So I think that Hill is not helpful to the State. My time has expired. Yes. Thank you, Your Honor. Mr. Field, good morning. Good morning, Your Honors. Michael Field for the Department of Transportation. Respectfully, the question before the Court today is not whether tolls in general are taxes under the Tax Injunction Act. The question before the Court is whether these tolls, whether the roadworks tolls, are taxes under the Tax Injunction Act. Would you agree that, well, I think it's, won't you agree that the test in San Juan Cellar is applicable to this case? I think the test in San Juan is applicable. I think Boston Regional Hospital interprets San Juan, so I think that that can't be ignored. But at the end of the day, the dominant factors that this Court has looked at are the purpose for which revenue is being raised and how that revenue is being used. What is that revenue? I'd like to go back to San Juan, the test, the three-part test in San Juan failure. What is the nature of the entity that's administering this fee? We submit that it's the Rhode Island Legislature, and I understand that it's the Department of Transportation that actually sets the amount of the toll, but that's guided by what the legislature says. And I understand that that may be true for most cases, but here the Rhode Island Legislature has set forth the specific authorization, not some general authorization for an agency to set rules and regulations to implement the enabling statute. It's a specific authorization to enact tolls at an amount that is according to the formula that the Rhode Island Legislature has set. Well, does the money go into the general fund? The money goes to a special fund. And who administers that fund? That fund is administered by the agency, by the Department of Transportation. And then the third factor, which is the dominant factor, is what is that revenue being used for? That revenue is being used for what the parties all uniformly acknowledge is a general public purpose. That's the most salient factor, and that's what this court has described as so. You know, here's the problem with that argument. Every time the government raises money by any mechanism whatsoever, almost by definition it's for a public purpose. That's just impossibly broad. That cannot be the test. That is not what Congress said in the Tax Injunction Act. Well, I think the test is how is that revenue being used? Who's using that revenue? So that test comes from San Juan Cellular, which decided the public purpose question in much narrower terms than the district court did here. I think that's fair to say. Okay, so where are the limits? The limits are who's benefiting from that revenue. When the beneficiary is a mayoral class... Meaning if all taxpayers benefit from improved roads, what about non-drivers? What about people who don't go over bridges? Well, as a plaintiff's note in their opening brief in one of the footnotes, I think it's footnote 9, Rhode Island has an integrated system for transportation. Rhode Island is 50 miles north to south, approximately 40 miles east to west. It's a small state. The general public benefits from transportation. That's true of every fee anybody charges when the money is used to assist the transportation system. It may be, and it may very well be that historically... So your test is if it involves public transportation, by definition the Tax Injunction Act does not apply? No, my test is... You opened with this is a roadworks toll, as though you're drawing a distinction between tolls on roads and tolls on other things. No, my focus is on when is that revenue being used for? And when it goes to benefit the general public, that is indicative of a tax. When a fee or an assessment goes to benefit a more narrow class, that's indicative of a fee. Rhode Island has a medical marijuana program, for instance. The revenue for using or the licensing goes into a restricted fund used only for medical marijuana users. That's a narrow class of beneficiaries. This is a much broader class of beneficiaries, as we've all acknowledged. The plaintiffs have acknowledged, and Judge Cagliari, you referenced this court's setting of approval of the Seventh Circuit case in Schneider. All of that is indicative of a more general public purpose, and quite frankly a traditional purpose for which the state has been responsible for, maintenance of the roads. But how is that different than the public purpose in SANS? The same reason that Your Honor just pointed out, which was, I think it was Your Honor, which is the distinction between a private and a governmental use. This is a fee assessed by or a charge assessed by the government. That's indicative of tax. And here the general purpose is even more broad than in the Schneider case, because under federal law, under Section 129, once Rhode Island certifies the maintenance of the bridge, it can be used for any 129 purpose. All right. So you're drawing a distinction between a private entity having a toll and a public entity having a toll. It used to be the case in, I don't know if it's still true, that government looked to privatize many public functions because it was more efficiently done that way. It could be done at a lower cost. So how does your theory work if the government is involved in privatizing and allowing proprietors to perform some public functions? I think this court under the Tax Injunction Act, it goes back to what Your Honor recognized as the policy underlining the Tax Injunction Act, where the plaintiff is seeking to restrain revenue going to the government for a public purpose. That affects what sovereigns are supposed to do. You're just back to your public purpose argument, and my question suggested that there were dual objectives in the Tax Injunction Act because of the limitation to state taxes and the careful noninterference with federal court jurisdiction if state taxes are not involved. Respectfully, Your Honor, I hope I am answering the question. Your answer made me wonder about privatization and the implications of your argument for all of that. I haven't thought that through. It just occurred to me listening to you. Quite frankly, I haven't thought it through either, but I think that if government is using privatization to achieve their public purposes, I can see where the Tax Injunction Act may be affected. But that's not this case. This case, Rhode Island is setting the tolls, the legislature. Rhode Island is collecting it. It is going into a department, a sovereign agency fund, and Rhode Island is using that money to effectuate what its leaders have said needs to be done, fix Rhode Island bridges. One of the main points I want to get back to is this notion that a toll can never be a tax under the Tax Injunction Act. Congress never had in mind in 1937, and I would submit that the operative time is 1867 when the Anti-Injunction Act was enacted, but Congress never had in mind in 1937 or any other period of time or specialty license plates or milk surcharges. Congress was concerned about restraining the flow of revenue to a state for a public purpose. That's what Congress had in mind in 1937. So it seems to me we have agreement at the ends of the spectrum referred to in San Juan. If you have a regulatory fee that funds the regulatory regime that regulates the entities, it seems everybody agrees that's not a tax. Conversely, if we have an income tax, everybody agrees that is a tax. So in between the two, we've come up with these multifactorial tests in which we debate how many factors there are, and then for each factor which seems to often have a qualitative component, we try to say where it's near. Why don't we just at this point say if we're not dealing with the ends of the spectrum and we're in the fuzzy middle, take our lead from the Supreme Court's Sebelius decision in the ACCA case and just say, look, this was all on the books. The statute was on the books. The Anti-Injunction Act was on the books when Rhode Island legislated here. And Rhode Island decided not to call this a tax and to call it a toll. So we'll go with that. Well, I think the Sebelius case had special reference because it was talking about how Congress labeled it. Sure, because Congress could amend its prior legislation, but you could simply say a state has an option. The legislators know they pay a political price if they call something a tax, but if they're willing to say it is a tax, why wouldn't in the fuzzy middle we give that some credence, eliminating all this litigation over multifactorial tests where people can't even agree on what the factors are? Well, I think there's no doubt you're right, Your Honor. I have some doubts that's right. I'm sorry? I have some doubts that's right. You then defer to the state legislature, which takes things that are plainly fees and labels them taxes, and you say that ends the matter? No, Your Honor. My point was that I think Judge Kayette is right that a tax is a four-letter word, and legislatures don't like to use the word tax, particularly for your point. I mean, if this were labeled a tax and I came up here saying, well, the legislature called it a tax and that's the end of the analysis, I think the plaintiffs in this court would have great doubts about that. So it may be the price tag of not using taxes but using user fees is the federal courts can exert jurisdiction over at least constitutional claims once the legislature has made that decision? Well, I think there's a couple of points. It goes back to the policy that Congress did have in mind at least in 1937, and I would say 1867, which is the general public purpose, and that's served by here. The other point that I was going to just go back to, Your Honor mentioned Hibbs. Hibbs was a situation where tax revenue was not being restrained. So under the Tax Injunction Act, that type of restraint, since there was no restraint on revenue, Hibbs wouldn't have applied. But that isn't the reasoning the court used? It may not have. I think there was a lot of different reasoning the court used. I think that the reasoning the court used in Hibbs was subsequently reeled in a little bit in the Levin case or distinguished in Levin. But nonetheless, Hibbs was a case where there was not a restraint on tax. You mean the First Circuit decision interpreted Hibbs? No, Your Honor. Levin was a U.S. Supreme Court case that came after Hibbs. Okay. I'll take another look at it. Speaking of precedent, is it correct that every single case that involved a toll, the court simply proceeded forward with no questioning as to its jurisdiction, and there's no case out there that holds what you want us to hold, that something that a legislature has called a toll on trucks or cars passing on highways, we should deem a tax under the statute? There's no tax injunction case out there that looks to tolls, whether they fall within or without the Tax Injunction Act. There's the Empress case that my friend mentioned. I think it was from the Seventh Circuit. That had nothing to do with transportation or tolls or anything. Quite frankly, Empress doesn't help them because that was an assessment on four casinos that went to five racetracks, and that was deemed to be a tax because it advanced a public purpose. But generally it seems to be, for the last 80 years, everyone's been sort of presuming, states and litigants and courts, that the Anti-Injunction Act would not apply to something like this. Because you can't, in all the challenges that there have been, you can't point to a single case that says, uh-huh, this toll is a tax. Nor can they point to a single case that says a toll is not a tax. No, but they can't point to a single case that says a cat is not a dog either. Everyone's presuming cats are cats. Everyone's presuming tolls are not taxes. There's another way of looking at that. I don't know why other courts haven't. To say that it hasn't been considered, that's not a fair, I don't respectfully believe that that's a fair statement. I don't know whether it's been considered or not. There certainly haven't been cases that have reached the merits of that Tax Injunction Act issue with respect to tolls. But let me give you an example, for instance. This court's decision in Doran. The plaintiffs cite that as evidence that the Tax Injunction Act can apply to tolls because this court's reached the merits in Doran. But Doran was a case where what was being challenged was a discount toll system. Again, the Tax Injunction Act wouldn't have applied in a discount situation because if this court or if the district court had held that discount system unconstitutional, it would have increased revenue. So these Tax Injunction Act cases turned very much on the facts of each specific situation. Doran wouldn't have been a Tax Injunction Act even if it had been raised. But none of them have turned your way, and you're correct, the others don't all expressly say that they're not turning you away. They just don't. But again, that brings me back to a signal that we're probably at best for you in the fuzzy middle here where we're having to debate all these factors. And again, when we're not at the end of the spectrum, when we're back to the middle, I still see some attractiveness in giving some weight to Rhode Island itself not seeking protection under the statute by calling it a tax. There was a point not too long ago where specialty license plates were never discussed. And two court of appeals have held that those fall within the tax of the Tax Injunction Act. The plaintiffs have made the point that they want to be in federal court. Our point has been that based on the Tax Injunction Act and the fact that that derives from Rhode Island's 11th Amendment immunity, we have a constitutional and statutory right to be in state court. And they acknowledge that the state court can provide absolutely every remedy and adequate remedy that the federal courts can provide. This has to do with whether federal courts can, as I think it's the Empress case talked about, chip away at what the Tax Injunction Act is meant to do. The Tax Injunction Act is meant to ensure that states and commonwealths and territories, Puerto Rico, can decide for themselves whether or not certain revenue is used to effectuate certain public purposes. But Congress gave federal question jurisdiction to the federal courts. It also gave diversity jurisdiction to the federal courts. Judge Wilkerson talks about the significance of that with respect to how the Tax Injunction Act should be interpreted. You're right, Judge Lynch, but Congress also took away that jurisdiction. It divested jurisdiction. In a limited way, yes. Thank you, Your Honors. Thank you. Mr. Tarantino? There's one more speaker, sir. Good morning. Good morning. May it please the Court, John Tarantino for the Turnpike and Bridge Authority. One thing that was not referenced, it's in our brief. I think it's exceptionally important to address some of the questions that Judge Lynch and Judge Kayada addressed, is that here there's another Rhode Island statute, and it specifically says that the Rhode Island DOT and the state tax assessor, the state tax administrator, form an agreement, it's at the appendix 111 through 114, that says what happens with these tolls? They are collected as taxes. The state administrator brings actions to collect with all the powers of taxation. That's what the Rhode Island statute says. It's 42-142.7. So if we're looking at what is the legislature thinking, and they have a statute that says the tolls that are not voluntarily paid are collected with all the powers of taxation. By whom? Not by an administrator, not by the agency, by the tax administrator. Okay, so you're saying people can get across the bridge without paying the tolls, and if they manage somehow to evade the tolls, the state tax collector is going to come out after them? There's a specific statute. That's not how tolls work. Has Rhode Island set up a system to allow that to happen? There are different ways to pay tolls. You can pay a toll like you can in most highways. You can have a reader. You can buy a reader, and you pay the toll that way. Otherwise, you are sent a bill. Your license plate is read, and you are sent a bill. But if you don't pay the bill, then what happens? It's collected as a tax. And what's in the record, please, about how often Rhode Island has to resort to this? It's only just begun, Your Honor. What's the experience in other states? I don't believe other states have a similar statute. Well, you come in from Logan, and they don't have a collection booth there anymore. They send you a bill. Correct me if I'm wrong. Is that a tax or is that a toll? I don't know enough about that, but I don't know how it's collected. Exactly the same way you described just now. You get a letter or a form in the mail saying that you owe them for that toll. Right. But if that happens, I don't know the instance. Is it collected by the state tax administrator with all the penalties, including penalties, taxation penalties? Are you saying that in ordinary course, the tolls are paid to the Department of Transportation, but if there's a defalcation, someone fails to pay in some manner, then the tax people take up the collection activity? That is correct. And that, therefore, turns everything into a tax. It doesn't turn everything. I didn't understand the state to say, oh, there's jurisdiction here in federal court, except for this narrow little defalcation of payments when the tax authorities go forward. It's all one statute. It's part of the same statute. And if part of the same statute and the MOU allows the tax administrator to treat these as taxes, all I'm saying is that cuts against the argument that the legislature defined this as a non-tax. Okay. Just a factual question. You say there's an MOU between the state administrative agency and the tax authorities. Correct. Okay. Is this required by legislation, or simply what does legislation have to do with the MOU? The legislature in 42142.7 said that the Rhode Island Department of Transportation may enter into. May enter into. Correct. Okay. It did not mandate it. It simply said if you make the choice to do this, you can do it. It is correct, Your Honor. Okay. Thank you. Thank you. Mr. Rothfeld, I believe you have some time. Thank you, Your Honor. Just a couple of quick points. First, in response to Judge Cahada's observation about cats and dogs and whether or not people thought that tolls may or may not be fees, so far as we are aware, every case in federal court involving a challenge to a toll has been preceded to adjudication on the merits. Nobody has suggested that the tolls were taxes that triggered the Tax Injunction Act. Most recently, in the OIDA case that the parties discussed in the Rule 28 J letters filed at the court, the Third Circuit entertained a challenge to Pennsylvania's highway tolls, and after the district court's decision in this case had asked the parties to be prepared to address the significance of the Tax Injunction Act at oral argument, and members of the panel raised questions about the Tax Injunction Act at argument, the Third Circuit went on to decide the case on the merits, and it specifically said that both the district court and the court of appeals had jurisdiction, necessarily concluding that the Tax Injunction Act did not apply to that toll. So I think that's yet another clear indication that courts regard tolls and taxes as being separate. And that is, in fact, one of the modes of analysis the Hibbs Court used to reach its result. I think that's correct, Your Honor. Second, my friend suggested that what Congress had in mind in 1937 was simply protecting state revenue. I think the clearest indication what Congress had in mind is the text that it used, the language that it selected, and the term that it used, tax, as we've been discussing, at the time had a settled meaning and had excluded tolls. I think that's the clearest indication of what Congress felt that it was doing, the Tax Injunction Act. On the question of whether public purpose, the public use of the funds can be dispositive, we think that that can't answer the question, certainly in a case like this. If you look at this court's decision in Trello and Reed, there's no doubt that the funds were being used for a general public purpose. It was providing essentially no-fault tax insurance for everybody who used the highways in Puerto Rico. That's a significant public purpose. The court nevertheless held that it was a fee. San Monsignor itself, the funds went to pay for the operations of the Public Service Commission. An effective operation of the Public Service Commission benefited everybody in Puerto Rico who used a telephone, which is to say everybody in Puerto Rico. Nevertheless, the court said that that was a fee. And so the fact that there is a general public purpose, some general public benefit, can't be dispositive, certainly in a case such as this. Judge Katta also raised the question of sort of the simplicity of the analysis, and the Supreme Court has said over and over again jurisdictional rules should be simple to apply, should not be ambiguous. I think our test as to whether tolls or taxes is simple, to answer the question, the state's test, is there a general public purpose, is ambiguous, it's going to lead to endless litigation, wasteful litigation. He would say it's even simpler than your test. I'm sorry, your? Your opponent would say that reducing all of this to public purpose is an even easier test to administer than the test you're advocating. I suppose that they would, but we know that that can't be right, because this court has said, many courts have said that some revenue, some revenue-raising measures are not taxes. You have to figure out what those are. And so the fact that funds are used for a purpose that benefits the public, as we were saying, that can't be the answer. You know, Judge Katta suggested a model of a decision that might go in your favor, but puts this in the fuzzy middle. Is it your position that this case is in the fuzzy middle, or is it your case that this is quite clearly not a tax? We think that it's absolutely, we are at the far end of the spectrum in the fee category. This is a paradigmatic fee. A user fee, it is imposed, as we talked about before, it's imposed on the user of a facility for the use, for the privilege of using that facility. It's charged in the amount that's calculated to pay for the maintenance and improvement of that facility. It can be used only for that purpose, as my friend recognized, it goes into a special fund, never goes into the state's general fund. That is a paradigmatic user fee. And I think, Judge Lynch, the point that you made is quite relevant here, that the states can finance their operations in all kinds of different ways. If the state wanted to use a general tax to pay for the roadworks improvements, it could have done that. It chose instead, it thought there was some benefit to it, to use a user fee. The effect of that user fee, as they've imposed it, is to export their burden, their revenue-raising burden to out-of-staters fuel and gas industry and commerce. If the state wants to do that, there are legal consequences that follow from that, and one of them is that they are not using a tax, and that means the Tax Injunction Act does not apply. If there are no further questions. Thank you. Thank you very much.